UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>v.<br><br>EPHREN TAYLOR, II and<br>WENDY JEAN CONNOR | )<br>)<br>) Criminal Docket No:<br>) 1:14-CR-217-WSD-AJB<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## POSITION OF DEFENDANT WITH RESPECT TO SENTENCING

Christopher Bruno
Bruno & Degenhardt, P.C.
10615 Judicial Drive, Suite 703
Fairfax, Virginia 22030

Linda Sheffield, Esq.
Law Offices of Linda Sheffield
1201 Peachtree Street, NE
400 Colony Square, Suite 200
Atlanta, Georgia 30361

UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) Criminal Docket No: |
| | ) 1:14-CR-217-WSD-AJB |
| v. | ) |
| | ) |
| EPHREN TAYLOR, II and | ) |
| WENDY JEAN CONNOR | ) |
| | ) |

## POSITION OF DEFENDANT WITH RESPECT TO SENTENCING

Defendant Ephren Taylor ("Mr. Taylor"), through the undersigned counsel, submits for the Court's consideration this sentencing memorandum in connection with his sentencing scheduled for March 17, 2015.[1] At the outset, Mr. Taylor respectfully submits that the 151-188 month advisory U.S. Sentencing Guideline range (after acceptance of responsibility), as agreed to by the parties, is reasonable and appropriate in this case. Furthermore, it is respectfully submitted that a sentence at the low-end of the above-referenced guideline range is both reasonable and appropriate.

Mr. Taylor raises three objections to the advisory guideline range as calculated in the PSR which resulted in an advisory guideline range of 360 –Life. In this regard, Mr. Taylor objects to a cumulative eight-level increase stemming from three specific offense

---

[1] Pursuant to Rule 32, *Federal Rules of Criminal Procedure* and Section 6A1.3 of the *United States Sentencing Guidelines*, Mr. Taylor hereby acknowledges that he has received and reviewed both the PSR prepared in this case and the revision thereto.

2

characteristics added to the advisory guideline range referenced in the plea agreement. Specifically, Mr. Taylor objects to a four-level increase based on the fact that the offense involved a violation of securities law pursuant to USSG §2B1.1(b)(19)(A), a two-level increase because the offense involved acting on behalf of a charitable, educational, religious or political organization pursuant to USSG §2B1.1(b)(9)(A) and a two-level increase because the offense involved sophisticated means pursuant to USSG §2B1.1(b)(10)(C).

For the reasons discussed below, it is respectfully submitted that Mr. Taylor's conduct, when considered in light of the factors set forth in Title 18, United States Code, Section 3553(a), warrants a departure from the advisory guidelines range contained in the plea agreement. It is further submitted that such a sentence would be a reasonable and appropriate sentence in light of all of the factors set forth in §3553(a).

Mr. Taylor fully appreciates the fact that his criminal activity resulted in serious and widespread harm to numerous unsuspecting victims in this blatant scheme to defraud. It is equally clear to Mr. Taylor that the reprehensible nature of his conduct is underscored by the fact that a number of the victims were duped during a sales pitch to a "captive audience." Further, as reflected in his allocution, Mr. Taylor readily accepts responsibility for his conduct and knows that he alone must face the consequences of his actions. Moreover, as we believe will become more readily apparent to the Court during the sentencing hearing, Mr. Taylor deeply regrets the harm that his conduct has caused to the victims.

In light of Mr. Taylor's acute sense of accountability and, steadfast sense of remorse and shame, in conjunction with other factors discussed in detail below, we

respectfully request that the Court impose an ultimate sentence that is in accordance with the overriding principle of 18 U.S.C. §3553(a) requiring a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals set forth in the Act. We respectfully submit that a departure from the low-end of the advisory guideline range contained in the plea agreement would be in accordance with the purposes of sentencing as delineated in the Act.

## OFFENSE CONDUCT

Beginning in at least April 2009, and continuing through October 2010, Mr. Taylor was the "face" of a systematic scheme that was designed to defraud the investing public through the sale of bogus promissory notes and worthless interests in a Sweepstakes Machines venture. In order to effectuate the goals and objectives of the scheme, Mr. Taylor and his co-conspirators deliberately deceived investors by making a number of affirmative misrepresentations and by also failing to disclose material facts concerning the so-called investment opportunities.

In essence, Mr. Taylor and his co-conspirators knew that there was no basis for promising the high rate of returns in connection with the investments. Moreover, he and his co-conspirators intentionally failed to utilize the proceeds from the offerings for their intended purpose; rather, the funds were used to pay the salaries and personal expenses of the culpable participants. In fact, when the group did make required payments to earlier investors, for the most part, these funds came from proceeds generated from later investors.

More specifically, Mr. Taylor was the CEO of, what was essentially, a small-cap, shell entity known as City Capital Corporation. Mr. Taylor aggressively promoted

himself as a highly successful, exceptionally young and talented financial guru. The main thrust of Mr. Taylor's sale-pitch was to denigrate traditional investment vehicles such as CDs, mutual funds and the stock market, characterizing them as "foolish" and "losers." On the other hand, he convinced victims that they could make far greater returns with investments in his ventures.

In order to target a large number of potential investors from all walks of life, Mr. Taylor and his public relations machine employed two distinct strategies. First, Mr. Taylor and his co-conspirators devised a widespread and pervasive media blitz – through live speeches, books, appearances on TV and radio shows, seminars and webinars – in order to lure unsuspecting victims. Moreover, in order to garner both credibility and an air of legitimacy, Mr. Taylor and his co-conspirators actively cultivated connections with a number of churches so that he could pitch his investment scheme to various congregations. It is beyond dispute that "captive victims" at the live presentations were lulled into the scheme as a direct result of the churches' "vouching" for Mr. Taylor's financial acumen.

Throughout the course of the scheme, Mr. Taylor and his co-conspirators, some of whom were culpably involved from the inception, enticed investors into purchasing promissory notes that would purportedly be used to purchase small businesses or real estate, which would pay an annual rate of return of 12%-20%. At other points in time, the group promoted the Sweepstakes Machines venture and it was represented to potential investors that the machines, essentially loaded with games, would be placed in high-traffic locations and that they would reap returns of 300% in the first year.

Along the way, Mr. Taylor and his cohorts made affirmative misrepresentations to investors concerning various aspects of his scheme, including the fact that the projections had no basis in truth or fact. The group also deliberately failed to disclose numerous material facts which would have effectively dissuaded victims from investing in City Capital Corporation's investment programs.

In reality, City Capital Corporation was nothing more than a paper entity which essentially never purchased the underlying assets as promised to investors. In order to avoid obligations stemming from the promissory notes, investors were enticed to "roll over" the notes in exchange for promises of an even greater rate of return. In addition, on other occasions, Mr. Taylor and his co-defendant created bogus account statements to hold investors at bay.

At its most base level, Mr. Taylor's offering opportunities were nothing more than "Ponzi Schemes." As indicated above, Mr. Taylor's plan had all of the trappings of a prototypical Ponzi Scheme; namely, the disbursement of new investor proceeds to pay earlier investors. Also indicative of the methodology of a Ponzi Scheme, investors were repeatedly lulled into believing that their investments were safe.

## TAYLOR'S ACCEPTANCE OF RESPONSIBILITY AND EFFORTS TO PROVIDE SUBSTANTIAL

Shortly after leaving City Capital Corporation in late 2010, Mr. Taylor came to the full realization that his own fraudulent conduct was not only inexplicable, but also reflective of a deep-seated character flaw. From that point forward, Mr. Taylor has openly acknowledged that his conduct was intended to defraud the investing public. Furthermore, Mr. Taylor has continuously admitted that throughout the life of the fraud scheme, he knew that his conduct was not only illegal, but also morally wrong. Most

Case 1:14-cr-00217-WSD-AJB   Document 61   Filed 03/11/15   Page 7 of 20

importantly, as is apparent to anyone who has come into contact with him will attest, Mr. Taylor has an overwhelming sense of shame and remorse for the harm that he has caused the victims of his fraud.

In late December 2011, Mr. Taylor retained counsel and repeatedly stated that he was determined to accept responsibility for his conduct. In early January 2012, in an effort to demonstrate his desire to be held accountable, Mr. Taylor unilaterally decided to provide counsel with his passport. In addition, Mr. Taylor directed counsel to contact the U.S. Securities Exchange Commission ("SEC") in order to begin the process of accepting responsibility for his conduct. On August 3, 2012, this Court entered a partial judgment against Mr. Taylor in the parallel SEC case (1:12-CV-01249-WSD).[2]

On June 17, 2014, immediately upon learning of the pending indictment, Mr. Taylor self-surrendered to law enforcement authorities in Kansas City, Missouri and was released on a personal recognizance bond with pretrial supervision. At the same time, Mr. Taylor directed counsel to inform the Government that he would in fact accept responsibility for his conduct and that he wished to plead guilty. Thereafter, on June 26, 2014, the defendant appeared in this District and his conditions of release were continued. On October 8, 2014, Mr. Taylor pled guilty to one-count of conspiracy to commit mail and wire fraud. Throughout this period of time, Mr. Taylor has been fully compliant with his conditions of release.

---

[2] In essence, the settlement was a "bifurcated settlement" whereby Mr. Taylor settled issues pertaining to liability and the parties agreed to leave outstanding the issue regarding the exact amount of disgorgement owed to the victims. On the other hand, Mr. Taylor's co-defendant decided to dispute the SEC's allegations and filed a motion to dismiss the complaint. On August 9, 2012, the Court denied the motion to dismiss (D.E.20). Thereafter, on October 31, 2012, the co-defendant followed suit and also entered into a bifurcated settlement with the SEC (D.E.21).

Since pleading guilty, Mr. Taylor has made a number of efforts to provide substantial assistance to law enforcement authorities. In particular, Mr. Taylor has participated in lengthy debriefing sessions with the U.S. Attorney's Office in this District, with the SEC in New York, with counsel for the Financial Industry Regulatory Authority ("FINRA") and with federal prosecutors in the Eastern District of New York.

During the course of all these in-depth proffer sessions, Mr. Taylor fully disclosed his role and the culpability of his co-conspirators in the scheme, and he did so without the benefit of any evidentiary use limitations or restrictions which would serve to limit the Government's use of his statements in the future. The fact that Mr. Taylor agreed to provide inculpatory statements to law enforcement without the protection of a *Kastigar* letter further highlights his unbending commitment to be held accountable for his actions.

Throughout the debriefing sessions, Mr. Taylor's goal was to be truthful and forthcoming, and he never sought to minimize his role in the fraud scheme. In an effort to provide as much information as possible, Mr. Taylor did not merely endeavor to respond in a cursory fashion to isolated questions; rather, he looked to the context of the specific line of questioning – the spirit of the question – in order to be as over inclusive as possible. It is respectfully submitted that Mr. Taylor's statements during all of the proffer sessions were in fact truthful, decisive and made without hesitancy.

In November 2014, Mr. Taylor met with the SEC in New York in connection with an ongoing investigation into a company that performed IRA roll over services for victims in the City Capital Corporation scheme. During the proffer session, Mr. Taylor provided detailed information regarding the existence of numerous "red flags," extending over a period of approximately seventeen months, in order to substantiate claims that the

company should have been aware of City Capital Corporation's fraudulent activities. Mr. Taylor also provided information concerning numerous meetings held with his co-conspirators during this period of time that were designed to specifically address potential questions by the IRA roll over company regarding the mechanics of the fraud. Subsequent to the proffer session and at the request of the SEC, Mr. Taylor has provided additional information and relevant documents to the staff.

Further, Mr. Taylor has assisted FINRA in anticipation of a scheduled enforcement proceeding against a licensed broker who sold City Capital Corporation investments to victims. Mr. Taylor's efforts are being utilized to not only substantiate FINRA's underlying claim of "selling away," but to also prove that the broker provided false testimony to the agency. After a full evaluation of Mr. Taylor's assistance, FINRA has decided to call him as a witness in the proceeding.[3]

In January 2015, Mr. Taylor met with the Government in this District and provided detailed information regarding his role and the role of others in the instant scheme. Based upon information provided during this proffer, Government counsel contacted federal prosecutors in another district to evaluate Mr. Taylor's ability to proactively cooperate against a well-known target.

As a result, on March 3, 2015, Mr. Taylor met with law enforcement authorities in the Eastern District of New York. However, during the course of the proffer session, it was determined that, based upon constitutional safeguards concerning the target, the Government was precluded from going forward with any undercover activities.

---

[3] Currently, FINRA is attempting to schedule Mr. Taylor's deposition for March 16, 2015. Based solely upon his assistance to date, FINRA counsel has offered to provide a letter to the Court outlining Mr. Taylor's assistance. We respectfully request to supplement this submission with FINRA's evaluation upon receipt of the letter.

## PERSONAL BACKGROUND

A review of the PSR indicates that Mr. Taylor, age 33, was reared in Kansas City, Missouri and comes from a hard-working supportive family. Mr. Taylor is a high-school graduate and in 2003, at the age 21, Mr. Taylor married his wife. The couple has two children, ages ten and nine and family currently resides in his parent's basement apartment. Mr. Taylor is a devoted father and husband. Despite his current situation, Mr. Taylor's family remains supportive.

From 2009 through present, Mr. Taylor has suffered from ongoing depression, which was heightened during the latter stages of the instant fraud scheme. In order to combat his depression, Mr. Taylor frequently used alcohol as a form of self-medication and he currently continues to do so. Mr. Taylor is currently proscribed medication for depression and participates in therapy sessions which have proven to be extremely beneficial.

## ARGUMENT

### The Offense Level Should Not Be Increased Pursuant to USSG §2B1.1(b)(19)(A)

As contained in the PSR, Mr. Taylor's advisory guideline was increased four-levels pursuant to USSG §2B1.1(b)(9)(A) because the offense involved a violation of securities law pursuant to USSG §2B1.1(b)(19)(A). We respectfully submit that, because of the undisputed facts in this case in conjunction with the purpose for the enhancement, a four-level adjustment to the guideline range is inappropriate.

The guidelines provide for a four-step increase if the offense involved a violation of the securities law and at the time of the offense, the defendant was (i) an officer or director of a publicly traded company; (ii) a registered broker dealer, or a person

associated with a broker or dealer; or (iii) an investment advisor, or a person associated with an investment advisor.

Based solely upon a plain reading of the enhancement, the PSR concludes that, because Mr. Taylor was nominally the CEO of City Capital Corporation and the fraud involved a violation of the securities law, a four-level increase is appropriate. However, it is clear that the intended purpose of the enhancement is to address those situations where corporate executives and licensed individuals use their positions of status to perpetrate a securities violation. In short, the enhancement contemplates that there be a direct nexus between an individual's specified status and the opportunity to in a securities law violation. In fact, *Application Note 15 (B)* states that "[F]or example, this subsection would apply if an officer of a publically traded company violated regulations issued by the [SEC] by fraudulently influencing an independent audit of the company's financial statements for the purpose of rendering such financial statements materially false or misleading…"

Although our research reveals a dearth of case law interpreting USSG §2B1.1(b)(19)(A), a review of the relevant cases could be interpreted in a per se fashion to support the notion that the enhancement should be applied based simply on one's status and the existence of an unrelated securities violation. However, we respectfully submit that relevant decisional authority indicates a more nuanced interpretation of the provision. Application of the enhancement requires that defendant's status be integral to the securities violation.

For example, in *U.S. v. Elia*, 579 Fed Appx. 752, 2014 U.S. App LEXIS 16881 (11th Circuit 2014) (Unpublished), the Court imposed the enhancement on an investment

11

advisor who utilized the façade of his special status to lure victims to invest in his investment fund. In *Elia*, the Court relied on the fact that the defendant represented that he was a licensed investment advisor and that he provided potential investors with brochures containing the logo of his "investment" company. In addition, because the defendant's brochures advised that people should invest in stocks rather than, for example government bonds, investors sent funds to the defendant's fund giving him complete authority to make investments on their behalf. See also, *U.S. v. Ogale*, 378 Fed. Appx. 959, 2010 U.S. App. LEXIS 9636, (11th Circuit 2010) (Unpublished), (defendant investment advisor enticed victims to invest in his hedge fund).

The Third Circuit reached a similar result in *U.S. v. Wosotowsky*, 527 Fed. Appx. 207 (3rd Circuit 2013 (Unpublished). In *Wosotowsky*, the defendant was a broker associated with the investment company MetLife. In order to effectuate his scheme, the defendant created a fictitious entity that he represented was a "clearing house or transfer company" that provided secure financial investments "under the umbrella of MetLife." In reliance on the District Court's statement that "… what we have here is a broker and he was dealing with securities, and the *manner in which he did it* was in violation of the securities law," the Third Circuit sustained the application of the enhancement. (emphasis added).

Here there can be no doubt that Mr. Taylor did not use his special status as the CEO of a publicly traded company to entice investors to invest in the promissory note program or the sweepstakes venture. In fact, as stated in the SEC's complaint in the parallel civil proceeding, the main thrust of Mr. Taylor's sale-pitch was to denigrate traditional investment vehicles such as CDs, mutual funds and the stock market, characterizing them

as "foolish" and "losers." On the other hand, he convinced victims that they could make far greater returns with investments in his private ventures. Moreover, unlike the CEO's conduct that the enhancement was intended to address, Mr. Taylor's conduct did not constitute a fraud on the financial markets.

Based on the above, we respectfully request that the Court not enhance the advisory guideline range by four-levels pursuant to USSG §2B1.1(b)(19)(A).

### The Offense Level Should Not Be Increased Pursuant to USSG §2B1.1(b)(9)(A)

As contained in the PSR, Mr. Taylor's advisory guideline was increased by two-levels because the offense involved acting on behalf of a charitable, educational, religious or political organization pursuant to USSG §2B1.1(b)(9)(A). We respectfully submit that a two-level adjustment to the guideline range pursuant to this enhancement would be inappropriate in this case.

First, although Mr. Taylor did sporadically represent that 20% of City Capital Corp. profits would go to charity, the vast majority of these representations occurred prior to the time delineated in the indictment. Second, Mr. Taylor never represented that he or his company were direct agents of any charitable or religious organization, whether real or fictional. More importantly, unlike the situation in *U.S. v. Treadwell*, 593 F.3d 990 (9th Circuit 2010), Mr. Taylor never represented that any portion of investor funds would earmarked for charitable use, rather, the only representation that was put forth was that City Capital Corp. profits, if any, would be forwarded to charity.

### The Offense Level Should Not Be Increased Pursuant to USSG §2B1.1(b)(10)(C)

As contained in the PSR, Mr. Taylor's advisory guideline was increased by two-levels because the offense involved sophisticated means pursuant to USSG

§2B1.1(b)(10)(C). While it is abundantly clear that Taylor made numerous affirmative misrepresentations, failed to disclose material facts, engaged in a widespread media blitz and lulled investors, he did not engage in any furtive conduct in order to disguise or conceal his role in the scheme, or the nature and degree of the fraudulent transactions. To the contrary, Taylor was the face of this fraud which involved other culpable co-conspirators. There simply was nothing especially complex or especially intricate pertaining to the execution or concealment of this base-level Ponzi scheme. Consequently, we respectfully submit that a two-level adjustment to the guideline range for sophisticated means would be inappropriate in this case.

We readily concede, as we must, that there is ample support for the proposition that all wide-spread fraud schemes, and in particular Ponzi schemes, involve in-depth planning, coordination and execution. However, when compared to other such schemes, Mr. Taylor's scheme was a prototypical Ponzi scheme. We respectfully request that the Court consider Mr. Taylor's scheme in relation to other similarly situated schemes to defraud.

In fact, the Sentencing Commission supports such a view toward the application of the sophisticated means enhancement. Currently pending for comment and approval are the most recent amendments to certain sentencing guideline provisions, including the sophisticated means enhancement. The Commission specifically considered whether the enhancement should be revised such that it applies based only on the defendant's conduct rather than the offense as a whole, and whether the conduct should be compared only to similar frauds or to all frauds that could fall within the scope of USSG §2B1.1.

As a result, the proposed amendment specifies that sophisticated means is determined relative to offenses of the same kind and it narrows the scope of the specific offense characteristic to cases in which the defendant used (rather than the offense involved) sophisticated means. In particular the proposed amendment now states "or (C) the offense involved sophisticated means" and specifically deletes the existing language which states "and the defendant engaged in or caused the conduct constituting sophisticated means." Moreover, Application Note 9 (B) in the proposed amendment now states:

"sophisticated mean" means especially complex or especially intricate offense conduct *that displays a significantly greater level of planning or employs significantly more advanced methods in executing or concealing the offense than a typical offense of the same kind.* The proposed amendment deletes the remaining language in the existing guideline and concludes: "*Conduct that is common to offenses of the same kind ordinarily does not constitute sophisticated means.*"[4]

We respectfully request that the Court give consideration to the wisdom expressed in the proposed amendment. In any event, Mr. Taylor's conduct in the case at hand did not involve sophisticated means. All of the relevant press releases, bank accounts and corporate entities were readily traceable to Mr. Taylor and only to him. Indeed the main thrust of the fraud was premised upon the dissemination of false information, not the intricate use of methods to conceal involvement. While this case certainly involved pervasive deceit and fraud, Mr. Taylor did not engage in any conduct (other than what is typically involved in a garden variety Ponzi Scheme) to disguise his role as the face of

---

[4] The italicized text above reflects the language in the proposed amendment.

the scheme at City Capital Corporation. As a result, we respectfully request that the Court not increase the advisory guideline range by two-levels for sophisticated means.

### Court should fashion a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of 18 U.S.C. § 3553.

In light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005), the sentencing guidelines are now advisory and as a result, a district court must "consider Guideline ranges," but may "tailor the sentencing in light of other statutory concerns as well." *Id.* at 757. Those factors include (a) the nature and circumstances of the offense and the history and characteristics of the defendant, (b) the kinds of sentences available, (c) the guideline range, (d) the need to avoid unwarranted sentencing disparities, (e) the need for restitution, and (f) the need for the sentence to reflect the following: the seriousness of the offense, to promote respect for the law and to provide just punishment for the offense, to afford adequate deterrence, to protect the public from future crimes and to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment. *See* 18 U.S.C. § 3553(a).

Since at least late 2011, Mr. Taylor has consistently demonstrated an acute sense of accountability, acceptance of responsibility and remorse for his conduct. Those in close contact with him are particularly aware of Mr. Taylor's single-minded focus on the harm that he has caused to the victims in this case.

It is respectfully submitted that Mr. Taylor has exhibited a level of remorse and acceptance of responsibility that is atypical of those involved in financial fraud schemes. In short, Mr. Taylor's sincere remorse does not mask an underlying regret for failing to

avoid detection. To the contrary, it is Mr. Taylor who insisted that a complete picture of his conduct be brought to light.

It is beyond dispute that Mr. Taylor has never sought to minimize his conduct nor sought to embellish the conduct of others simply to reduce his own exposure. Most importantly, Mr. Taylor has never sought to minimize his conduct while others sought to mask their own involvement by promoting Mr. Taylor as the recognizable face of the fraud. Rather, Mr. Taylor has always fully acknowledged that he opted to engage in this fraud with his "eyes wide open" and that he knew his conduct was not only illegal, but also wrong.

We respectfully request that the Court recognize Mr. Taylor's efforts to cooperate in the instant case, with the SEC in New York, in connection with the FINRA case and in the ongoing investigation in the Eastern District of New York. As the Second Circuit has confirmed in *U.S. v. Diaz-Tejada*, 2009 U.S. App. LEXIS 3768 (2nd Cir. 2009), "[the defendant] is correct that attempted cooperation is a factor to be considered under §3553(a)." *See also, U.S. V. Fernandez*, 443 F.3d 19, 30 (2nd Cir. 2006) (District Courts should consider the fact that a defendant made efforts to cooperate, even if those efforts did not yield a government motion for a downward departure). Consequently, this Court should consider Mr. Taylor's efforts to cooperate in fashioning an ultimate sentence, even in the absence of a Government motion for a downward departure.

Given the personal strides that he has made since his decision to accept responsibility, it is respectfully submitted that a sentence at the low end of the advisory guideline range contained in the plea agreement would serve to provide hope to Mr.

Taylor that he still could effectuate meaningful changes, not only in his life, but for the benefit of others.

We respectfully submit that a reduction from the low end of the advisory guideline range as contained in the plea agreement is justified in light of his steadfast acceptance of responsibility and his efforts to cooperate in conjunction with other factors set forth in 18 U.S.C. § 3553(a).

## CONCLUSION

For the forgoing reasons, Mr. Taylor respectfully requests that that the Court impose a sentence that reflects a reduction from the low end of the guideline range contained in the plea agreement which would result in a sentence that is "sufficient, but not greater than necessary" to comply with the sentencing goals set forth in Section 3553(a).

In addition, Mr. Taylor requests that the Court recommend to the Bureau of Prisons that he be designated to serve his sentence at the federal facility located in Leavenworth, Kansas.

Finally, in light of his past alcohol history, Mr. Taylor also requests that the Court recommend to the Bureau of Prisons that he be placed in a Residential Drug Program at the facility.

Dated: March 10, 2015

                                            Respectfully submitted,

                                            /s/ Christopher Bruno
                                          Christopher Bruno, Esq.
                                          Virginia Bar No. 47651
                                          Bruno & Degenhardt, PC.
                                          10615 Judicial Drive, Suite 703
                                          Fairfax, Virginia 22030
                                          Telephone: (703) 352-8960
                                          Facsimile: (703) 352-8930
                                          Email-cbruno@brunodegenhardt.com
                                          *Lead Counsel for Defendant Taylor*

                                            /s/ Linda Sheffield
                                          Linda Sheffield, Esq.
                                          Georgia Bar No. 639725
                                          Law Offices of Linda Sheffield
                                          1201 Peachtree Street, NE
                                          400 Colony Square, Suite 200
                                          Atlanta, Georgia 30361
                                          Telephone: (770) 671-1234
                                          Facsimile: (678) 809-3301
                                          Email-lindasheffield@gmail.com
                                          *Local Counsel*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 10th day of March, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing is being served this day upon all counsel of record by means of electronic filing with CM/ECF.

/s/ Christopher Bruno
Christopher Bruno, Esq.