IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

UNITED STATES OF AMERICA

  *v.*

EPHREN TAYLOR, II, AND
WENDY CONNOR

Criminal Action No.

1:14-CR-217-WSD

### United States' Reply to Ephren Taylor and Wendy Connor's Sentencing Memoranda

The United States of America, by John A. Horn, Acting United States Attorney, and Christopher J. Huber, Assistant United States Attorney for the Northern District of Georgia, files this Reply to United States Defendants Ephren Taylor and Wendy Connor's Sentencing Memoranda to assist the Court in resolving disputed Guideline issues and in imposing a reasonable sentence under 18 U.S.C. § 3553.

### Argument

### 1.  The Guidelines As Calculated in the PSR are Correct for Defendant Taylor

First, to clarify, the Government never agreed that a 151-188 month Guidelines range would apply.  Instead, in Defendant Taylor's plea agreement, he and the Government agreed to recommend to the Court that certain enhancements and reductions would apply.  Doc. 40-1 at 5-6 (Plea Agreement).

1

The plea agreement did not include an agreement as to the final Guidelines range or an agreement that the parties would recommend against the application of certain enhancements.  To the contrary, counsel specifically discussed the potential imposition of several of the enhancements at issue here, and the Government's contention that those enhancements would apply, including the sophisticated means enhancement, § 2B1.1(b)(10)(C), and the enhancement because the offense involved a misrepresentation that the defendant was acting on behalf of a charitable organization, § 2B1.1(b)(9)(A).  The enhancements agreed to in the plea agreement set a floor of a Guidelines range of 151-188, but did not restrict the Government from advocating for a higher range, consistent with the PSR.

### A. The Offense Involved a Misrepresentation that the Defendant was Acting on Behalf of a Charitable Organization

Defendant Taylor makes three arguments that the enhancement that the offense involved a misrepresentation that the defendant was acting on behalf of a charitable or religious organization should not apply.

First, he argues that it should not apply because the majority of the representations were made before the alleged conspiracy dates in the indictment. Even if there were _more_ false representations made before the conspiracy period, a brief review of the Exhibits attached to the Government's Sentencing Memorandum demonstrate that there were widespread representations made during that period.  For example, Exhibit 12 is a marketing brochure for the

sweepstakes machines, a part of the fraud that was not even begun until Defendant Connor joined City Capital in 2009 (and, thus, falls squarely in the conspiracy period alleged in the indictment). That Exhibit was widely distributed and has multiple references to the fact that City Capital will donate to charity:

- "**20% of the profits go directly to charity**: Virtually no other business goes this far. Not only does this aspect make the Sweepstakes program rock-solid in the eyes of the law, it is simply the right thing to do." Ex. 12 at 3 (SEC-F-CONWAYL-B-000108).

- "Q: Which charities receive contributions from this program?
  A: We have multiple charitable efforts to which we contribute. These include a summer camp for terminally ill teens in Texas, bio-fuel initiatives, and giving away turkeys in underprivileged neighborhoods in Rolesville, North Carolina." Ex. 12 at 10 (SEC-F-CONWAYL-B-000115).

- "Also, 20% of the profits go directly to charity." Ex. 12 at 10 (SEC-F-CONWAYL-B-000115).

Similarly, Exhibit 18 is a press release that was issued on February 26, 2010 (in the middle of the alleged conspiracy period), that states that "a major portion of the proceeds will be donated to charities across the country, as part of the partnership's philanthropic innitiatives [sic]." Ex. 18 at 1 (SEC-F-DorioA-I-000004). Exhibit 19, likewise, is a press release from February 2010 touting the charitable nature of City Capital, saying that Defendant Taylor "announced that City Capital Corporation . . . launches Clean Sweeps Holdings, LLC to build a network of interactive charitable fundraising kiosks on the global stage. . . . Clean Sweeps Holdings . . . currently leverages innovative gaming technology to

assist retail merchants in increasing revenue while assisting charities with raising much needed financial resources."  Ex. 19 at 1 (SEC-F-BURKARTB-B-000038).  It goes on to say that "[w]hen consumers purchase the promoted items, a portion of those proceeds helps to raise financial resources for selected charities" and that it "currently operates two charitable fundraising centers in the states of Texas and North Carolina."  Ex. 19 at 1 (SEC-F-BURKARTB-B-000038).

The marketing email at Exhibit 22, sent on May 27, 2010, also emphasizes the supposed charitable nature of the sweepstakes program.  "One last key advantage about City Capital sweepstakes machines is that 20% of all profits generated from machines are donated to charity."  Ex. 22 at 4 (SEC-F-BURKARTB-B000028).

Finally, during the Wealth Tour in late 2009, Defendant Taylor cloaked himself in religion, relying on the religious affinity of the congregations to exploit his victims' charitable impulses.  *See, generally,* Ex. 6 (transcript of Defendant Taylor's remarks at New Birth Missionary Baptist Church).

All of these promises and fraudulent statements about charity were made during the timeframe of the conspiracy alleged in the indictment and to which Defendant Taylor pleaded guilty.

Second, citing no cases, Defendant Taylor argues that he never represented that he or City Capital was a "direct agent" of any charitable or religious organization.  This is an overly narrow reading of the enhancement.  As the comment to the enhancement states, "Subsection (b)(9)(A) applies in any case in

4

which the defendant represented that the defendant was acting <u>to obtain a</u> <u>benefit on behalf of a charitable . . . organization</u> . . . (regardless of whether the defendant actually was associated with the organization . . .)." U.S.S.G. § 2B1.1, cmt. 8(B) (emphasis added). It does not require a representation that the defendant is an agent of the charity.

In addition, the *Treadwell* case cited by Defendant Taylor directly rejects this argument, holding "that the term 'acting on behalf of' does not require acting as a direct representative or agent of a charity." *United States v. Treadwell*, 593 F.3d 990, 1008 (9th Cir. 2010); *see also United States v. Cohen*, 742 F.3d 856, 859 (9th Cir. 2013) ("*Treadwell* established that this enhancement can apply where defendants do not purport to directly represent a charitable organization.").

Third, Defendant Taylor argues that because he only claimed that <u>profits</u>, rather than a part of investor funds, would be donated to charity, the enhancement does not apply. Yet, this is precisely what the defendants in both *Treadwell* and *Cohen* promised. In *Treadwell*, the defendants told victims that "'some of the programs that we're involved in, a certain percentage <u>of the</u> <u>returns</u> that we do uh, gain from those projects do have to be returned into humanitarian needs . . . .'" *Treadwell*, 593 F.3d at 1005 (emphasis added). The defendant in *Cohen* "pretended to be interested in diverting some of the results of for-profit investments to charities and represented that the donors' investment would inure to the benefit of a charity." *Cohen*, 742 F.3d at 860. Indeed, he offered to sell shares at a supposedly discounted price, "ostensibly conditioning

5

his offer on the donors' promise to give half their profits to charity." *Cohen*, 742 F.3d at 858 (emphasis added). *See also United States v. Robinson*, 165 F.3d 912, 1998 WL 789179, *5 (4th Cir. Nov. 13, 1998) (enhancement applies where victims understood "that a portion of their returns would go to the charitable and religious purposes of [the Defendant's organization]").

Because Defendant Taylor preyed upon his victims' charitable instincts and promised that his company would donate a portion of its proceeds to charity, *see* Ex. 19 at 1 (SEC-F-BURKARTB-B-000038), the Court should find that the enhancement applies.

### B. The Court Should Apply the Sentencing Guidelines as Written and Find that the Offense Involved Sophisticated Means

Defendant Taylor essentially concedes that his fraud scheme meets the Sentencing Guidelines definition of sophisticated means under § 2B1.1(b)(10)(C), instead asking the Court to evaluate whether the enhancement should apply based on a proposed amendment to that section of the Sentencing Guidelines. The Guidelines expressly contemplate, and reject, such consideration by the Court. They state that "the court shall use the Guidelines Manual in effect on the date that the defendant is sentenced." U.S.S.G. § 1B1.11(a)(emphasis added). This is known as the "one book rule." *United States v. Bailey*, 123 F.3d 1381, 1403-4 (11th Cir. 1997). The Court of Appeals for the Eleventh Circuit has held that the one book rule applies to amendments to the Guidelines that have been approved by the Sentencing Commission and that will take effect absent

Congressional action.  *United States v. White*, 579 F. App'x 942, 947 (11th Cir. 2014).  Here, the proposed amendments are mere proposals and have not even been approved by the Sentencing Commission, and thus are even more tenuous than the amendment considered (and rejected) in *White*.

Thus, the Court should find that the Guidelines apply as currently written and that the sophisticated means enhancement applies.

## C. Defendant Taylor Was CEO of City Capital When He Violated the Securities Laws and the Four Level Enhancement is Appropriate

Defendant Taylor argues that the four level enhancement pursuant to U.S.S.G. § 2B1.1(b)(19)(A) should not apply because he claims there is no "direct nexus" between his position as CEO and his fraud.  Initially, the Court should reject this argument as a legal matter.  There is nothing in the enhancement that suggests such a reading and at least one Court of Appeals has squarely rejected it.  *See United States v. Bartko*, 728 F.3d 327, 346-47 (4th Cir. 2013).  *Bartko* states:

> Without citation, [the defendant] maintains that "[t]he purpose of this enhancement is not to increase the punishment for anybody who happened to have a broker-dealer license who commits a securities law violation."  He is mistaken.  The meaning of the Guideline is clear.  Under § 2B1.1(b)(18) [the previous citation for this enhancement], the district court is to impose a four-level enhancement when a broker or dealer's criminal offense involves a securities law violation.  There is no dispute that [the defendant] was a broker and that his offense involved a securities violation.  Thus, the four-level enhancement was proper.

7

728 F.3d at 346-47.  Similarly, here, there is no dispute that Defendant Taylor was the CEO of City Capital, a publicly traded company, and that he committed a securities law violation.  On that basis alone, based on a plain reading of the Guideline, the enhancement applies.

In addition, Defendant Taylor in fact used his status as CEO to entice his victims to invest in his fraudulent scheme.  For example, in the sweepstakes brochure at Exhibit 12, his position as CEO is touted in an effort to induce victims to invest:

> Hi! My name is Ephren Taylor.  You may have seen me interviewed on international outlets such as the Montel Williams Show, CNN, CNBC, The Today Show, 20/20, Fox Business News, Good Morning America, and many more . . . .
>
> I went on to build a massive empire that made me millions by age 19, and I became the first African-American to ever take a company public at just 23 years of age. . . .
>
> Today, at age 27, my attention has been refocused on another venture and it has already been extremely lucrative.  My company, City Capital Corporation, has been opening new stores across the nation for the last 2 years.

Ex. 12 at 2-3 (SEC-F-CONWAYL-B-000107-8). It goes on to say:

> Plus, you can relax knowing…
>
> **You are teaming up with a self-made millionaire that has a proven track record of success**

I made my first $1 million at just 16, and I sold my first business for $3 million at 19.  Today, I run two public companies and manage hundreds of millions of dollars.  I've published a top-selling book and have worked with many celebrities from athletes to musicians, as well as major Wall Street investors and nonprofit organizations.

In other words, this is not some fly-by-night operation.  We have been opening and operating these stores for over 2 years with over 3,000 Sweepstakes machines.  This program is a meticulously planned initiative designed and created to ensure great profits for individuals like you!

This means you are tapping into a proven system.  We know how to setup these stores, where to set them up, how to get customers in the door, and how to maximize YOUR profits!

Ex. 12 at 6 (SEC-F-CONWAYL-B-000111).

In another marketing piece, City Capital identifies Defendant Taylor as its

"*Celebrity CEO.*"  Ex. 22 at 3 (SEC-F-BURKHARTB-B-000027).  It says:

*Celebrity CEO*

City Capital Corporation is headed by CEO Ephren Taylor. You may have seen him on major nationwide media like Montel Williams, 20/20, The Today Show, CNN, CNBC, Fox Business, and so much more.

Ephren is also a Wall-Street Journal best selling author *Creating Success From The Inside Out* and he travels the country to share his financial advice to sell-out crowds, often in the thousands.

This media exposure helps open doors and secure high-profile partnerships for rapid expansion.

*A Surefire Bet*

The bottom-line is City Capital Corporation is far from a "fly-by-the-night" operation. When you invest in our stock, you're getting:

• A proven management team with experience not just in the sweepstakes business, but similar proven ATM, vending, and retail operations.

• Headed by celebrity CEO, Ephren Taylor who has been featured in nationwide media, like Montel Williams, 20/20, CNN, CNBC, Fox Business, The Today Show, and many more.

• We go above and beyond all state regulations by giving 20% of all profits to charity (this is a TRUE sweepstakes).

Ex. 22 at 3-4 (SEC-F-BURKHARTB-B-000027-8).

Similar descriptions of Defendant Taylor's position as CEO as a benefit to investors were provided to the victims at New Birth church. *See* Ex. 25.[1]  In that document, titled "Eliminate the Roadblocks to Profitable & Secure Real Estate Investing," Defendant Taylor is again touted as an asset to the investors:

---

[1] For simplicity, attachments to this Reply will continue with the Exhibit numbers from the Government's initial Sentencing Memorandum.  Thus, the first attachment to this Reply is labelled Exhibit 25.

> From the **Wall Street Economic Summit** to the **White House Forum** and **HUD Affordable Housing Conferences** . . . our CEO Ephren Taylor is a regular panelist and keynote speaker, a sought-after expert on the need for what we do.  And all of this brings a much higher interest in our programs and markets than any individual investor could possible hope for alone. . . .
>
> **City Capital Corporation (CTCC)** is a public company engaged in leveraging investments, holdings and other assets to create self-sufficiency for communities in the U.S. and internationally. . . .
>
> **About City Capital CEO Ephren W. Taylor II**
>
> Ephren W. Taylor II has been recognized as America's Youngest African American CEO of any public company. . . .  He combines a keen eye for successful projects with an understanding of the business processes and strategies needed to make them succeed.  Ephren Taylor is considered a "*high-performance visionary with the ability to make things happen, when nobody else can.*"

Ex. 25 at 21, 23 (SEC-F-MENDANOA-B-000048, 50).  This information was given to potential victims at New Birth Missionary Baptist Church.  *See* Ex. 26 at 1 (SEC-F-WC-I-0003462).

Finally, in yet another marketing piece that was sent out as late as October 14, 2010, just as the entire fraud was collapsing, Defendant Taylor was still being touted as a real benefit to City Capital's investors.  In the section titled "**Investigate Before You Invest**" the brochure said:

As has already been mentioned, we encourage you to investigate before you commit, just as with any investment. . . .  We are a public company (CTCC) actively engaged in turning the tide of poverty and hopelessness and creating affordable homes for working-class families nationwide. . . .

Google our founder and CEO, Ephren W. Taylor II.  He created these concepts as a teenager, and was honored with the Kansas Young Entrepreneur of the Year award as a result. . . .

Mr. Taylor has served as a keynote speaker for dozens of colleges and business organizations . . . .  Taylor's message to young people from coast-to-coast is one of empowerment and self-sufficiency.

His Urban Wealth Tour visited 18 cities in 2007 presenting his economic empowerment message to thousands across America, bringing together educational, non-profit and government leaders to create positive change in urban communities.  Even as he delivers this message to standing-room-only Tour audiences, he is opening new doors of partnership and opportunity with municipal, state, community and corporate representatives in each city.  Many new project opportunities have resulted, new local key contact relationships established, and new prospective investors attracted to the company through the Urban Wealth Tour. . . .

Unlike many corporate powerhouse CEOs, Taylor focuses on socially-conscious investing and development while making significant profits for his investors.

Ex. 27 at 31-32 (SEC-F-CONWAYL-B-000032-33).

These documents demonstrate that Defendant Taylor and City Capital used his position as CEO to induce victims to invest in his fraudulent schemes.  The enhancement is justified and should be applied.

**2.  Response to Defendant Connor's Sentencing Memorandum**

Given that Defendant Connor did not object to the enhancements recommended by her PSR, a significant reply is not necessary.  There are two points that bear clarification, however.

First, the PSR calculated Defendant Connor's Total Offense Level as 38, not 36.  *See* Connor PSR at 26.  As with Defendant Taylor, the stipulations in Defendant Connor's plea agreement do not limit the applicability of other, relevant enhancements.  As such, application of the two level enhancement because the offense involved the misrepresentation that the Defendant was acting on behalf of a charitable or religious organization is appropriate, leading to a Total Offense Level of 38.

Second, it is not the seven year sentence that the Government is recommending that establishes the "initial benchmark" for this Court to consider, but rather the correct Guidelines calculations.  *United States v. Gall*, 552, U.S. 38, 49 (2007) ("As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.").  Here, the correct Total Offense Level is 38, resulting in a Guidelines range of 235-293 months.  That should be the starting point for this Court.  The Government's recommendation of a seven year sentence is a recognition of the factors in 18 U.S.C. § 3553, including Defendant Connor's background, role in the offense, cooperation, and that the Guidelines would result in a sentence that is greater than necessary.  Conversely, the Government

13

would contend that a sentence below seven years would not adequately address Defendant Connor's culpability or the severity of the offense.

### Conclusion

For the foregoing reasons, the Government respectfully requests that the Court sentence Defendant Taylor to 20 year's incarceration and sentence Defendant Connor to seven year's incarceration.

Respectfully submitted,

JOHN A. HORN
*Acting United States Attorney*


/s/CHRISTOPHER J. HUBER
*Assistant United States Attorney*
Georgia Bar No. 545627
chris.huber@usdoj.gov

**Certificate of Service**

I served this document today by filing it using the Court's CM/ECF system, which automatically notifies the parties and counsel of record.

Christopher Bruno

*Counsel for Ephren Taylor, II*

Linda S. Sheffield

*Counsel for Ephren Taylor, II*

Daniel R. Meachum

*Counsel for Wendy Connor*

March 12, 2015

/s/ Christopher J. Huber

Christopher J. Huber

*Assistant United States Attorney*